# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4135-23
                A-0240-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

D.J. and E.G.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF E.M.G.,
a minor.

_____

Argued October 8, 2025 – Decided November 3, 2025

Before Judges Sumners and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0037-24.

Ryan T. Clark, Designated Counsel, argued the cause for appellant D.J. (Jennifer N. Sellitti, Public Defender, attorney; Ryan T. Clark, on the briefs).

Deric Wu, Designated Counsel, argued the cause for appellant E.G. (Jennifer N. Sellitti, Public Defender, attorney; Deric Wu, on the briefs).

Alicia Y. Bergman, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Acting Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Alicia Y. Bergman, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

In these consolidated appeals, D.J. (Della) and E.G. (Edward) appeal from the Family Part's order terminating their parental rights to their three-and-a-half-year-old son, E.M.G. (Earl).[1] The Division of Child Protection and Permanency (Division) and the Law Guardian urge that we uphold the orders. We affirm because we conclude the trial judge's order, as explained in her oral decision, tracks the four-prong best interest of the child test pursuant to N.J.S.A. 30:4C-15.1(a), and is supported by the clear and convincing evidence in the record.

---

[1] Pseudonyms are used to preserve confidentiality.

I.

In October 2021, the Division received a child protective services referral for Earl the day after he was born by cesarean section at thirty-two weeks' gestation, weighing only 2.87 pounds.  The next month, the Division initiated this litigation by filing a complaint for custody of Earl, which the court granted.  Two years later, the Division filed a guardianship complaint.

Following a two-day trial, the judge reserved decision and issued an oral decision terminating Della and Edward's parental rights to Earl.  We incorporate the judge's findings by reference, highlighting those pertinent to this appeal in addressing the parties' respective arguments.  Before doing so, we briefly discuss the principles that guide our analysis.

II.

Our review of a trial judge's termination of parental rights is limited.  N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454, 468 (App. Div. 2017).  A judge's termination decision will not be reversed "when there is substantial credible evidence in the record to support the court's findings."  Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).  We defer to the judge's fact-findings and credibility determinations.  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552-53 (2014).  Deference is

accorded to the judge's findings of fact due to "the Family Part['s] . . . 'special expertise in . . . domestic relations.'" Id. at 553 (quoting Cesare v. Cesare, 154 N.J. 394, 412-13 (1998)). Trial judges have the opportunity to make first-hand credibility judgments about witnesses, gaining a "feel of the case" not obtainable from a cold record. E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

"Only when the trial [judge's] conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure . . . there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)). Interpretations of law are reviewed de novo. D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

To decide whether to terminate parental rights, a trial judge considers the statutory four-prong best interests test which we discuss below. See N.J.S.A. 30:4C-15.1(a)(1) to (4). The Division must prove the four prongs by "clear and convincing" evidence. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 611-12 (1986). The prongs "are not discrete and separate; they . . . overlap . . . to . . . comprehensive[ly] . . . identif[y] a child's best interests." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999). These considerations are

4

fact-sensitive and require particularized evidence addressing the specific circumstances. Ibid.

III.

A. Prongs One and Two

The first and second prongs "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

As to prong one, the Division must prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship." N.J.S.A. 30:4C-15.1(a)(1). "[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." M.M., 189 N.J. at 289.

"Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." In re Guardianship of K.L.F., 129 N.J. 32, 44 (1992) (citing In re Guardianship of J.C., 129 N.J. 1, 18 (1992)). As a result, "courts must consider the potential psychological damage that may result from reunification[,] as the 'potential return of a child to a parent

may be so injurious that it would bar such an alternative.'" N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 480-81 (App. Div. 2012) (quoting A.W., 103 N.J. at 605).

"The absence of physical abuse or neglect is not conclusive." A.W., 103 N.J. at 605 (quoting In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977)). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." D.M.H., 161 N.J. at 379. "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383.

As to prong two, the Division must prove that "[t]he parent is unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

"The second prong of the statutory standard relates to parental unfitness." K.H.O., 161 N.J. at 352. The prong requires a judge to consider whether it is reasonably foreseeable that a parent could "cease to inflict harm upon" a child entrusted to them. A.W., 103 N.J. at 607. In satisfying the prong's evidentiary burden, the Division may demonstrate how a parent is unable to: (1) "provide

'a safe and stable home for the child' and a 'delay in permanent placement' will further the harm to the child," K.H.O., 161 N.J. at 347 (quoting N.J.S.A. 30:4C-15.1(a)(2)); or (2) "cure[] the initial cause of harm and will continue to cause serious and lasting harm for the child," J.C., 129 N.J. at 10.  The judge may consider a parent's:  (1) past behavior because past harm can be predictive of future abuse or neglect of another child, see J. v. M., 157 N.J. Super. 478, 493 (App. Div. 1978), and a child's mere "exposure to a parent's physical abuse of a child may well be abusive to" other children, N.J. Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002); and (2) "delay in [securing] permanent placement" for the child because a delay is a harm in itself, K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)).

1. Della

Della asserts the trial judge erred in finding that Earl's health and development were or would be endangered by the parental relationship with her. Citing N.J. Div. of Youth and Fam. Servs. v. A.L., 213 N.J. 1, 23 (2013) and N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 331-32 (App. Div. 2011), she argues the Division did not establish her drug use during Earl's pregnancy caused him actual harm given his healthy condition or that he would be in imminent danger if she is awarded custody due to her subsequent positive

7

drug tests. Della emphasizes there was no expert testimony linking Earl's low birth weight or premature birth to her "alleged" drug use. Della asserts the Division and trial judge could not identify "one concrete emotional or physical injury that Earl ever sustained."

Della argues the trial judge erred in finding she was unwilling or unable to eliminate the harm facing Earl or to provide a safe and stable home for him now or in the foreseeable future. She stresses that despite being recognized as attentive and loving during visits with Earl, the trial judge unduly focused on his three-year placement with Lucy, her positive drug tests during trial, and her untreated mental health issues.

Della contends "her stable family housing, reliable income, and active care of Earl" undermines the judge's assessment of prongs one and two. She asserts that, despite various positive tests for marijuana and cocaine, the facts "establish that [she] has both the ability and the willingness to address any alleged harm to Earl, and that her consistent engagement, stable home environment, and demonstrated commitment to sobriety confirm she can eliminate any risk facing her son."

The trial judge's finding that the Division established prongs one and two by clear and convincing evidence is supported by the record. Della's long

8

history with the Division,[2] coupled with Earl's low birth weight and positive meconium test, led to the child being placed in resource care at birth and denied him permanence. Her substance abuse exposed Earl to illicit substances in utero. Della openly admitted using marijuana and cocaine "as a way of coping with stress and processing emotions." She initially refused a substance abuse evaluation, delaying in-patient treatment. After ending in-patient treatment against medical advice before completion, she returned but again left after one day. Della tested positive for marijuana and cocaine in the months leading up to trial. Her inability to remain clean and sober strongly indicates prongs one and two are met, showing Earl's health and safety would continue to be endangered, and Della is unwilling or unable to eliminate the harm that caused his lack of stability and permanency. N.J.S.A. 30:4c-15.1(a)(1) and (2); see also D.M.H., 161 N.J. at 379; T.S., 417 N.J. Super. at 245.

Moreover, Dr. Elizabeth Stillwell's uncontested expert opinion was that Della is unlikely to obtain long-term sobriety. The judge's acceptance of the

---

[2] Della's history with the Division predates Earl's birth. She is the biological mother of six other children not subject to this litigation. Her rights to her three eldest children were terminated in 1999 and they were adopted by their paternal grandmother. Della shares two other children with Edward, A.S.G. and E.A.G.; however, both their parental rights to these children were terminated in 2019. Her sixth child, D.M.J., is in the sole legal custody of a different biological father.

A-4135-23

opinion is supported by Della's long history of substance abuse and failure to comply with services, as illustrated by the prior termination of her parental rights with five other children. Further, despite her positive visits with Earl, she was frequently late and acted hostile towards Division staff and Edward. This evinces her emotional instability and supports the conclusion that it is not "reasonably foreseeable" she will cure the behavior that led to Earl's foster placement. N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 167 (2010) (quoting A.W., 103 N.J. at 607).

Della relies on V.T., a Title 9 abuse and neglect case, for the proposition that failure to overcome an addiction without relapse does not necessarily equate to a finding of abuse and or neglect. 423 N.J. Super. at 331. However, Title 30 termination proceedings do not require a finding of abuse or neglect under Title 9, K.M., 136 N.J. at 556. Della's drug use, in part, caused Earl's foster placement, and during the three years of this litigation, she has not shown she is willing or capable of getting the problem under control.

2. Edward

Edward argues the judge's reliance on his domestic disputes with Della is unwarranted. Della was the only one arrested when she assaulted him in 2018. There were domestic violence incidents after that, and the Division's

administrative substantiation for abuse and neglect against him, based in part on the domestic violence allegations, was removed. He stresses that "Dr. Stillwell's report does not evince any conversation between her and [him] about domestic violence," and therefore her opinion about his lack of "insight" was a generalized negative opinion.

Edward asserts the judge's conclusion that his home was unsuitable for a child at the time of trial "was based on an assumption, not actual evidence." He admits his home was "extremely cluttered" at the Division's inspections but attributes the condition to working six to seven days a week as a truck driver. He stresses that since he was "given detailed instructions on what would need to be fixed," the Division has not inspected his home.

Edward contends that by the time the trial began, he was regularly visiting Earl, interacting with his son positively and forming a "bond," so his delay in regularly visiting Earl until he was sixteen months old should not be reason to terminate his parental rights.

Edward maintains the question of whether he was "able or willing to overcome [the Division's] initial concerns" has been answered by his compliance with services, and his demonstrated bond with Earl. He rebuffs the trial judge's finding that he failed to plan for his son and her finding of fault based on his

11

work schedule. He stresses he had a "clear plan" to retire and had identified "other sources of income," including Social Security benefits, his Newark Housing Authority pension, and "numerous family supports," including a cousin who runs a daycare.

Edward argues that by the trial date he established he was "capable of parenting, committed to his son and amenable to the change derived from services." He notes the trial court's findings that he failed his home inspections, the delay in engaging with the Division, and his failure to understand the domestic violence history with Della but argues these factors do not rise to the level of harm to be cured by the "capital punishment" of the parent-child relationship. N.J. Div. of Youth & Fam. Servs. v. V.J., 386 N.J. Super. 71, 80 (Ch. Div. 2004).

The judge's finding that the Division proved the first two prongs relative to Edward is supported by the record. Edward failed to offer himself as a permanent option for Earl for two years. He was unresponsive to Division workers' phone calls, inconsistently attended visits with his son, and at times "expressed no interest in visiting with [Earl]." Even after he advised the court he was willing to serve as Earl's primary caregiver in March 2023, he again told the Division later that month he would "not be involved in this case" any longer,

12

and failed to visit his son for over three months.  This "withdrawal of . . . solitude, nurture and care" endangered the health and development of Earl. D.M.H., 161 N.J. at 379.

While Edward did, at times, show improvement regarding his interest in Earl over the course of this litigation, the record shows he is unable to provide a safe and stable home for Earl and further delay of permanent placement will add to the harm.  N.J.S.A. 30:4C-15.1(a)(2).  While it is not Edward's fault no sex offender clinicians were available in the months directly preceding this trial, he had ample opportunity to engage in this service during and prior to the FN and FG litigation and failed.[3]  He was referred to sex offender therapy by Dr. Hutchins in 2017, Dr. Winston in 2018, Dr. Stillwell in 2019, and Dr. Swanson in 2022.  However, Edward refused services and denied wrongdoing, even

---

[3]  In 2003, Edward was indicted for second-degree sexual assault and second-degree endangering the welfare of an eight-year-old child.  The victim was an eight-year-old child of one of Edward's tenants.  Edward pled guilty to endangering the welfare of a minor and the sexual assault charge was dropped. He claims he only pleaded to endangering "so that he would be released from jail," and served only one year of probation.  Edward notes that by trial, he had "completed individual therapy and could not complete sex specific therapy simply because there were no therapists available."  He argues it "was not clear [he] even needed sex specific therapy as Dr. [Kinya] Swanson . . . admitted that [his] 'sexually-related offenses are less significant than originally thought.'"

A-4135-23

though he had been substantiated for two incidents of sexual abuse and convicted of child endangerment.

Moreover, Edward failed to present a home that was fit for a child. At the Division's first home assessment in June 2022, Edward's one-bedroom was "very cluttered with furniture, shoes and clothing scattered everywhere, dirty dishes, and carpet." In August 2023, clutter remained "throughout the entire apartment," with "hazards to an infant" present such as "broken sheet rock walls and other building objects protruding throughout the apartment." After he told the court he wanted to become Earl's primary caregiver, he did not show up to two home assessment appointments in April 2024. And after the Division finally assessed the apartment, it was found to be in the same "cluttered" and "deplorable conditions" as before, with "roaches crawling up the wall."

The record supports the judge's determination that Dr. Stillwell's unrefuted opinion that Edward displayed a "lack of genuine commitment to [Earl]," a condition that is "unlikely to change."

B. Prong Three

Only the second part of prong three[4] is contested here. It requires courts to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). There must be clear and convincing evidence the resource parent is "committed unambiguously, unequivocally, and unconditionally to adoption, regardless of the possible alternative of [kinship legal guardian (KLG)]." N.J. Div. of Youth & Fam. Servs. v. M.M., 459 N.J. Super. 246, 273 (App. Div. 2019).

1. Della and Edward

Della and Edward raise similar arguments that Earl's foster mother, L.C.S. (Lucy) and father,[5] was not fully aware of the KLG option.

Della argues the judge failed to ensure Lucy's preference for adoption was fully informed as her testimony "demonstrated only a minimal distinction" between adoption and KLG. Della argues there is "no indication [Lucy] was apprised of the services or financial support that might be available under KLG,

---

[4] N.J.S.A. 30:4C-15.1(a)(3) provides: "The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights."

[5] The record does not disclose his name.

A-4135-23

nor that she recognized the same 'rights, responsibilities and authority' she would hold as a legal guardian." N.J.S.A. 3B:12A-6(e)(1).

Della also argues the judge did not comply with the July 2021 Legislative Amendments when considering alternatives to termination of her parental rights. She explains that before the amendments, "courts could only explore KLG if adoption was 'neither feasible nor likely.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 512 (2004). The July 2021 amendment removed the "feasible nor likely" language from N.J.S.A. 3B:12A-6(d), making KLG a viable permanency option, even if the foster parent prefers adoption, as long as it serves the child's best interest.

Della claims the judge did not properly evaluate whether KLG was in Earl's best interest. She argues the judge "dismissed KLG solely because the foster mother indicated her willingness to adopt and [the Division] had ruled out paternal relatives." She claims the judge could have preserved benefits for Earl, such as "inheritance rights, and other potential advantages set forth in N.J.S.A. 3B:12A-6(e),[6]" if it had "fully explored KLG" and determined what was in his

---

[6] N.J.S.A. 3B:12A-6(e) provides:

> The court order appointing the kinship legal guardian
> shall specify, as appropriate, that:

(1) a kinship legal guardian shall have the same rights, responsibilities and authority relating to the child as a birth parent, including, but not limited to: making decisions concerning the child's care and well-being; consenting to routine and emergency medical and mental health needs; arranging and consenting to educational plans for the child; applying for financial assistance and social services for which the child is eligible; applying for a motor vehicle operator's license; applying for admission to college; responsibility for activities necessary to ensure the child's safety, permanency and well-being; and ensuring the maintenance and protection of the child; except that a kinship legal guardian may not consent to the adoption of the child or a name change for the child;

(2) the birth parent of the child retains the authority to consent to the adoption of the child or a name change for the child;

(3) the birth parent of the child retains the obligation to pay child support;

(4) the birth parent of the child retains the right to visitation or parenting time with the child, as determined by the court;

(5) the appointment of a kinship legal guardian does not limit or terminate any rights or benefits derived from the child's parents, including, but not limited to, those relating to inheritance or eligibility for benefits or insurance; and

(6) kinship legal guardianship terminates when the child reaches 18 years of age or when the child is no longer continuously enrolled in a secondary education program, whichever event occurs later, or when kinship legal guardianship is otherwise terminated.

A-4135-23

best interest.  Thus, Della contends "termination of [her] parental rights should be reversed or, at minimum, remanded for a proper best-interests analysis under the current statutory framework."

Edward disputes the judge's finding that Lucy "clearly understood the difference between adoption and [KLG]," arguing the differences between the two are "far broader" than Lucy indicated she understood.  Edward argues there was no indication Lucy knew Earl would benefit from Edward's continued duty to pay child support.  He also maintains Earl's right to inherit from him is particularly relevant, given his work history and his desire to purchase homes for all his children.

Edward argues "there was no indication that the [judge] ever determined whether KLG would have been in [Earl's] best interests;" instead, the judge "ruled out KLG simply because the foster mother was willing to adopt and [the Division] had ruled out all of [Earl's] relatives."  Moreover, he argues that foster parents do not need to be related to the natural parent or child to be considered for KLG.  N.J.S.A. 3B:12A-2, -5, and -6.  Edward emphasizes that while a judge "should not impose KLG on resource parents stridently opposed to the arrangement," a judge also should not impose adoption and severance of the child's bond with his parent when, as here, KLG is in the child's best interests.

18

The record belies Della and Edward's arguments. The Division presented Lucy with a "KLG vs. Adoption" comparison chart explaining the differences between the two, including inheritance rights. N.J. Dep't of Child. & Families, Adoption and KLG Comparison Chart, Acknowledgement Receipt, CP&P 4-18. Lucy confirmed her commitment to adopting Earl numerous times throughout this litigation, and indicated her understanding of the process, as she had adopted in the past. She testified at trial that she understood adoption "means [Earl] would become [her] son," which she preferred over KLG, since, with the latter, "the parents can come back if they want" and she did not "want any problems in the future." Given Lucy's previously expressed concerns with Della and her trial testimony, there is no reason to disturb the trial court's finding that Lucy, "having adopted children in the past[,] clearly understood the difference between adoption and [KLG] as she wants to adopt [Earl]."

Della and Edward's arguments that the trial judge did not follow proper procedure in considering alternatives to adoption given the July 2021 amendment to Title 30 also fail. Prior to the amendment, courts were required to find that adoption was "neither feasible nor likely" before granting KLG. P.P., 180 N.J. at 509. While the amendment to the KLG statute removed the "neither feasible nor likely" language, N.J.S.A. 3B:12A-6(a)(2), placing KLG

on an equal footing with adoption, the 2021 amendments did not amend the third prong of the best interests test, N.J. Div. of Child Prot. & Perm. v. D.C.A., 256 N.J. 4, 25 (2023). In other words, while the amendments made KLG easier to obtain, they did not alter the termination of parental rights analysis. Lucy did not petition for KLG as required by N.J.S.A. 3B:12A-5 but instead professed her desire to adopt Earl.

C. Prong Four

The fourth prong assesses whether termination will do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). The prong "serves as a fail-safe against termination even where the remaining standards have been met" and it "does not provide an independent basis for termination where the other standards have not been satisfied." G.L., 191 N.J. at 609. The prong assesses "the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013). A child's need for permanency is paramount. M.M. 189 N.J. at 281. As such, "[k]eeping the child in limbo, hoping for some long-term unification plan, would be a misapplication of the law." N.J. Div. of Youth and Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

"When a bond exists between the child and the caretaker parent, and the biological parents cannot correct their poor conduct, the termination of their parental rights will not do more harm than good."  H.R., 431 N.J. Super. at 226 (citing E.P., 196 N.J. at 108 ).  The trial court should consider "the harm that would result from disrupting whatever bonds the child has formed."  N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 29 (App. Div. 2022), aff'd 256 N.J. 4 (2023).  If it is "shown that the bond with [the] foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy the requirement of [prong four] that termination of parental rights will not do more harm than good to the child."  K.H.O., 161 N.J. at 363. "It [is] well within the discretion of the trial court to accept the unrebutted and unequivocal opinion of the Division's expert."  N.J. Div. of Youth and Fam. Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013) (citation omitted).

### 1. Della and Edward

Della contends that the Division failed to prove that terminating her parental rights would not cause Earl serious and enduring harm.  She asserts that termination would cause "unnecessary and irreversible harm" to Earl and their relationship, rather than promote his well-being.  She cites Division records showing she and Earl share a "positive, secure attachment" and characterizing

her as "hands on," "attentive," and "appropriate" when caring for Earl. This was echoed by Dr. Stillwell's reflection that she had a "positive" bond with Earl. Della argues "the uncontested record firmly establishes a meaningful parent-child relationship."

Della further argues the Division failed to show that Earl's relationship with Lucy would "fully mitigate the significant emotional loss he would experience if his bond with Della is permanently severed." She claims she has consistently attended his medical appointments, participated in therapies, and been involved in healthcare decisions.

Della avers that neither an adequate foster home nor the foster parent's commitment to permanency demonstrate that "the child will not be harmed by permanent severance." She argues the question is whether the finality of adoption outweighs Earl's interest in retaining a strong positive bond with her that it "will not do more harm than good." G.L., 191 N.J. at 609. She asserts the trial court lacked thorough, competent, and specific proof that severance will not cause serious and enduring harm and instead improperly relied on Dr. Stillwell's conclusion that Lucy could mitigate any harm, without "grappling with the strong, documented evidence of [her] consistent involvement and affectionate bond." J.C., 129 N.J. at 26; G.L., 191 N.J. at 609.

A-4135-23

Della argues her past indiscretions and terminations of parental rights "cannot override the clear evidence that she is now engaged, supportive, and bonded with Earl." She argues reversal is warranted because the trial judge did not conduct a more stringent analysis of the harm Earl would suffer from terminating her parental rights, including whether Lucy could mitigate that harm, and whether "less-drastic alternatives" would better serve his best interests.

As for Edward, he contends the Division's concerns with him "were nowhere near the type of egregious conduct that requires the severance of his relationship with his son." Edward stresses he eventually complied with services and could not complete sex offender therapy for reasons outside his control. He also argues he had a viable plan to care for his son. Edward rejects Dr. Stillwell's conclusion that Earl's resource parents were his psychological parents, and Earl had not developed a "secure attachment" to his birth parents. Though Earl sees his foster parents as his "caretakers," he has a "strong bond with [Edward]," developed through hours of visits where Edward cared for him, cooked for him, and attended to his needs. Because the "existence of a healthy attachment between a child and the child's resource family parent does not in and of itself preclude the child from maintaining, forming or repairing

23

relationships with the child's parent," L. 2021, c.154(f), Edward argues the termination of his parental rights should be reversed so that he may be given the opportunity to reunify with his son.

We find no merit to Della or Edward's contentions. The trial judge's finding that termination would not do more harm than good is supported by the record. Dr. Stillwell conducted a bonding evaluation of Earl with Della, Edward, and Lucy, and determined that Earl would not suffer harm due to termination because Lucy was his psychological parent and terminating his relationship with Della and Edward would "not disrupt that permanency." Dr. Stillwell testified that "for a child to form a secure attachment there needs to be consistency[] [and] reliability," and Earl was never in Della or Edward's care "for any extended period of time where that quality of attachment would have been allowed to form."

Conversely, Earl formed "secure attachments" and "strong bonds" with Lucy. See N.J. Div. of Child Prot. & Permanency v. N.C.M., 438 N.J. Super. 356, 372-73 (App. Div. 2014) (finding prong four satisfied where expert testified the child had a secure attachment to their resource parent and not the biological parent). Dr. Stillwell concluded that termination of the parental rights of both Della and Edward would not do more harm than good, and the trial court was

well within its discretion to adopt the doctor's finding. J.S., 433 N.J. Super. at 93.

Moreover, neither Della nor Edward presented expert opinion refuting Dr. Stillwell's conclusions. Della's argument that she has taken "remedial steps" sufficient to overcome her substance abuse problem is unsubstantiated and merely asserts that public policy favors reunification. While it is clear she loves her son, Earl's "paramount need" for a permanent, stable, and defined parent-child relationship, K.H.O., 161 N.J. at 355, will not be met unless the path is cleared for adoption by his resource parent. Maintaining the status quo for any length of time will harm Earl, leaving him "in limbo" and depriving him of necessary permanence. A.G., 344 N.J. Super. at 438.

In sum, the trial judge's termination of Della and Edward's parental rights was in Earl's best interests.

To the extent that we have not addressed any of the parties' arguments, it is because they lack sufficient merit to be discussed in a written opinion. R. 2:11-3(e)(1)(E).

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-4135-23